Whitaker, Judge,
dissenting:
I am unable to agree with the opinion of the majority. In determining its net loss plaintiff deducted depreciation. The fact that it received from the insurance company $54,860.69 more than the depreciated book value of the equipment that was destroyed shows that it had taken more depreciation than it should have taken. Likewise, the fact that it was able to sell some of the equipment used on the job for *8 $290,409.01 more than its depreciated book value, shows that it had taken too much depreciation on it. Its claimed loss, therefore, should be offset by the amount of the excessive depreciation taken.
JoNes, Chief Judge, concurs in this dissent.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner Roald A. Hogenson, and the briefs and argument of counsel, as follows:
1. The plaintiff is an Illinois corporation with its principal office at Chicago, Illinois.
2. This action is founded upon the Lucas Act, 60 Stat. 902, as amended, 62 Stat. 992.
3. On August 31,1938, the defendant’s Bureau of Reclamation, Department of the Interior, advertised for bids for furnishing labor and materials and performing all work for the construction of the Green Mountain Dam and Power Plant, Colorado-Big Thompson Project, in conformity with Specifications No. 797. Bids were opened October 12, 1938, at Denver, Colorado.
The plaintiff’s bid was in the sum of $4,226,206.20. Four other bids were in the several amounts of $4,258,851; $4,727,022.13; $4,828,227 and $5,570,287.
4. The plaintiff had been engaged in the general contracting business for 48 years, and in heavy construction for the last 18 years. Prior to its bidding on the Green Mountain project, it had built several earth-filled dams on the Mississippi River and performed railroad and. building construction for other agencies of the defendant, and also performed heavy construction contracts for the city of Chicago and the State of Illinois. Until it undertook the Green Mountain job, the plaintiff and its supervisory personnel had had no experience in the construction of an earth-filled dam in a mountainous region.
The defendant’s Bid Committee considered that plaintiff was well qualified from an experience viewpoint to handle the construction of the Green Mountain Dam and Power Plant, and recommended that it be awarded the contract, *9 provided that proper investigation revealed that plaintiff was qualified financially to carry the work to completion.
5. On November 15, 1988, the plaintiff and defendant entered into Contract No. 12r-9319 for the construction of the Green Mountain project for the bid price. The performance was to start within 30, and be completed within 1,620, calendar days from the receipt by the plaintiff of notice to proceed.
The plaintiff received notice to proceed on December 1, 1938, and the contract completion date was established as May 9, 1943. Plaintiff immediately began to move equipment onto the site and started to excavate the tunnel for diversion of the river.
6. The project site was on the Blue Kiver on the west slope of the Continental Divide, about 16 miles south of Kremm-ling, Colorado, and 125 miles west of the city of Denver.
The crest of the completed dam was 7,960 feet above sea level. Work areas were about 7,700 feet elevation in the dam foundation to 8,275 feet in the upper reaches of the borrow pit.
The winter climate in the area is severely cold, with temperatures as low as 50 degrees below zero Fahrenheit. Most of the construction work had to be suspended during the winter season and earth-filling operations were limited to approximately 6 months during each calendar year.
7. The principal features of the construction were the earth dam across the river, an outlet works through the right abutment, an open channel spillway at the left abutment, and cut-off walls extending along the axis of the dam at its base.
The contract specifications provided that the dam be approximately 1,300 feet long, at its crest, with a maximum height of 270 feet above the bed of the river.
The main body or core of the dam was to consist of a moistened and rolled embankment of clay, sand, and gravel, containing no stones which would not pass through a grizzly having 3-inch openings. This mixture was to be placed in continuous, approximately horizontal layers, each to be not more than 6 inches thick after compaction by passing, tamp *10 ing rollers over it 12 times. Approximately 3.5 million cubic yards of earth fill were necessary.
The upstream slope was to be covered with a 3-foot layer of rock riprap on a variable slope, the largest boulders and rock fragments to be not more than one-half of a cubic yard in volume, with the average not less than one cubic foot.
The downstream slope was to have a basic covering of semi-impervious material, graded from clay, sand, and gravel at the inner slope to sand, gravel, cobbles, and slide rock at the outer slope, with a heavy covering of a porous mixture of rock fragments, boulders and cobbles, the largest piece of which would not exceed one cubic yard in volume.
The upstream and downstream slopes required approximately 956,000 cubic yards of cobble, rock and riprap.
8. Prior to submitting its bid, the plaintiff sent its president and its chief engineer to the dam site where they discussed the project with the defendant’s resident engineer, who advised them that there was surface water in some portions of the borrow pit and that the real problem of the job was the separation and processing of materials. The plaintiff’s representatives visited the borrow pit site, studied the log, records and the screened materials from test pits in the borrow area, and were advised of the severe winter weather in that locality.
9. A tentative construction program was appended to the contract specifications, which, in the opinion of the defendant’s engineers, would effect the completion of the project within the contract time. This suggested schedule was solely for the purpose of assisting the contractor in preparing its own construction program. It showed the placing of earth fill in the dam embankment during September and October 1939, and during approximately 5% months, beginning May 1, of each of the years 1940,1941, and 1942.
During the 1939 construction season, the plaintiff accomplished the driving of the river diversion tunnel and the excavation of the dam site and the outlet works, but did not undertake the placing of any earth fill. The dam foundation was not fully prepared, and no screening plant had been constructed or provided.
*11 10. At 12:01 a. m., March 15, 1939, all work was stopped on the project by a strike called by the C. I. O. union. The strikers took possession of the plaintiff’s camp and forcibly stopped all work until 4:00 p. m., March 21, 1939, when work was resumed on a reduced scale by a portion of the employees in accordance with an order of the Industrial Commission of Colorado. Even when work was resumed with a full crew the next day, there was considerable unrest and dissatisfaction among the employees. During the reorganization period, the progress of the work was materially reduced. The contracting officer found that the contractor was delayed for a period of six calendar days during the actual strike and for an additional four calendar days during the reorganization period. This delay was without the fault and beyond the control of the plaintiff.
At 4: 00 p. m., July 12, 1939, another strike, called by the A. F. of L. union, stopped all performance. No regular work was done from July 13, through August 4,1939. There were many acts of violence, and on August 2, the Governor of Colorado declared martial law, and the National Guard came to the project on August 3. Work was resumed on a reduced scale on August 5, but unrest of the employees delayed resumption of normal operations. A power line was dynamited on the night of August 2-3 and again on the night of August 5-6. Dynamite with cap and fuse attached was found under the powder make-up house the night of August 9-10. On the night of August 24-25, nine sticks of dynamite with fuse and cap attached were found over a tunnel roof support and were removed by the National Guard. Seven men were shot during the strike. The contracting officer found that the contractor was delayed 28 calendar days during the strike and reorganization period thereafter. This delay was without the fault and beyond the control of the plaintiff.
During the period between these two jurisdictional strikes, and for a long period thereafter, there was a great deal of unrest and ill feeling among the employees.
11. By his Findings of Fact dated May 22, 1943, the contracting officer extended the contract performance period 46 calendar days, 38 days of which were attributed to the strikes *12 and the other 8 days to delay of the defendant in locating the upstream portal of the tunnel and to interruption of power by a snowslide, and again by lightning striking transformers.
The performance period was thus extended from May 9 to June 24,1948, and the plaintiff completed the project within the time allowed.
12. The plaintiff had competent supervisory personnel throughout the contract performance. Its president, Thomas L. Warner, had general direction of the prosecution of the job, and kept in close contact with it. He had been in the contracting business all of his mature life, with experience in heavy construction for some 18 years. He took up residence in Denver, Colorado, during 1939 and spent considerable time at the construction site.
Gus Eix was the plaintiff’s superintendent from commencement of operations until about the end of June 1939 when he left to return to his home in Minnesota because his family disliked the living conditions and labor strife on the project. He had been with the plaintiff for five years and supervised dam and embankment construction on the Mississippi River, and had had previous experience in heavy construction with other contractors. He was replaced by Richard Ostland, who was assisted by A. K. Anderson, both of whom had . been long employed by the plaintiff and had had considerable experience on prior heavy construction jobs. Mr. Ost-land ..was a graduate engineer and had been serving on the plaintiff’s project engineering staff. Mr. Eix returned as superintendent in the spring of 1940, and continued as such until October 1940, when James Fogg became superintendent for the rest of the contract performance. Mr. Fogg was an expert superintendent of long experience on earth work and embankment construction, and marked improvement in the volume of earth filling occurred during his superintendency.
..The progress of the earth-filling operations under the previous superintendents was impeded by labor strife, by the preliminary work incident to the excavation and preparation of the dam site, by the circumstances that the placing and compaction of the lower layers of the embankment required much hand tamping in the gorges and crevices of the *13 natural abutments and along the cut-off walls and concrete abutments, and by the difficulties encountered in providing an adequate plant for the separation and processing of the materials from the borrow pit.
13. The specifications required the separation of materials obtained from the dam site excavation and the borrow pit in order to accomplish the placing of graded fills in the main body and slopes of the dam embankment, as described in Finding No. 7. The borrow pit specified by the defendant consisted of an unusually tough glacial drift, with a high percentage of boulders and large rocks. It was the toughest material that the defendant’s constructiqn engineer, in his experience on earth-filled dams since 1914, had ever heard of or encountered.
In its Statement of Equipment submitted with its bid, the plaintiff indicated that it intended to use two earth separation plants. Soon after receiving the contract the plaintiff’s officials discussed the problem with various engineers and suppliers of equipment, including the Koppers Company, the Bucyrus Erie Company, and the Manitowoc Engineering Works. The plaintiff retained William Creager, a consulting engineer, who had previously designed earth-filled dams and been employed as a consultant by the defendant on numerous other earth-fill projects. The plaintiff’s officials conferred with other contractors and visited other projects on which separation of materials was required.
14. After its studies and consultations, the plaintiff decided upon a mobile separation plant, mounted upon caterpillar traction with propelling power, to move about in the borrow pit and be fed directly by a power shovel or dragline. The plan was to avoid the haul of unseparated material from the borrow pit to a stationary plant, and thereby limit the trucking of the materials to the movement from the mobile plant to the point of deposit on the dam embankment.
On November 2, 1939, the plaintiff submitted to the defendant’s construction engineer plans made by the Mani-towoc Engineering Works for the mobile separation plant, and requested constructive criticism of its function and design, since it would be an expensive machine and a new and distinct departure from general practice. By letter dated *14 November 10, 1939, the defendant’s construction engineer advised the plaintiff that he had prepared the requested criticism and submitted it to his Denver office for approval and transmittal. This letter of criticism was not transmitted to the plaintiff.
On November 17, 1939, the defendant’s chief engineer by letter advised the construction engineer at the site that the contract specifications could be accomplished through use of an almost infinite variety of screening plants as partly evidenced on other jobs completed or then in progress, that the Bureau could not specify the method or approve or disapprove any equipment and could only approve or disapprove the result and condemn equipment which failed to produce the required result, and that it was questionable whether any criticisms should be made to the contractor in writing.
15. The defendant’s construction engineer shortly thereafter discussed orally with the plaintiff’s chief engineer the substance of the criticisms which he had submitted for approval to his Denver office, which are summarized as follows: (1) That the proposed construction of only one self-propelled machine would necessitate a large, unwieldy unit, and would eliminate the opportunity for testing and correcting one unit before constructing another, and in case of a breakdown all embankment operations would have to stop until repaired; that since materials for the graded mixture in six-inch horizontal layers in the embankment would have to come in part from the borrow area and in part from the abutments, it would be necessary to have two processing machines, or haul the materials from the abutments to the separating machine, or move the machine some distance to the materials, which would be inconvenient and costly. (2) That the plans did not show any method of cleaning the screens and that some mechanical device might be necessary. (3) That the hopper for the earth-fill material had only a 25-cubic yard capacity, equivalent to the capacity of one truck, which would necessitate the stoppage of the plant unless trucks were available. (4) That the machine would have to move on a fairly level road to insure proper operation, which could probably be arranged by shovel cuts; and that clearance for trucks under the machine was small, but could probably *15 be made adequate by use of a bulldozer. (5) That the machine must operate on a plane, preferably horizontal, and would not be flexible in operations as it could not be moved from one class of materials to another without delay in performance. (6) That trucks to be loaded with earth fill and those with cobbles would both pass under the machine, and since cobbles would be about one-fifth of the embankment material, careful timing of cobble trucks would be necessary to prevent cobbles from accumulating and shutting down the plant, or to prevent cobble trucks from being only partly loaded at times. (7) That a stationary plant would be more practicable. (8) That nothing in the criticisms was intended as approval or disapproval of the proposed machine, as its suitability for the required service could not be determined except by a test under working conditions.
16. The plaintiff thereafter had the mobile separating plant manufactured by the Manitowoc Engineering Works at an original cost of $60,000.00. It was placed in operation about May 20, 1940, and used until August 25, 1940. During this period, the plaintiff separated and placed 204,000 cubic yards of rolled fill in the embankment.
The plaintiff first considered the use of a dragline to feed the mobile separating plant, but found that the dragline bucket would take up rock too large for the 3-inch screening grill. The separating machine was fed by a 5-cubic yard shovel which had to operate approximately parallel with the plant. Because of the height of the lift to place the shovel load upon the screen, it was necessary for the shovel to excavate from a tier in the borrow pit about 5 or 6 feet higher than the base level of the separating machine, which had to be maneuvered to correlate its position with the shovel.
The unusually tough material and heavy boulders beat up the screening grill and caused heavy maintenance costs. Large rocks and rough terrain slowed the maneuverability of the plant and reduced production of separated materials. The plaintiff soon determined that the mobile plant was unsuitable and planned a stationary plant with a 12-inch grizzly to carry off the larger rock and limit the burden upon the 3-inch grill to rock between 3 and 12 inches in size.
17. The first stationary plant commenced operations about *16 August 31, 1940, and was operated until November 3, 1940, which was the end of the season for placing embankment material, during which time approximately 149,000 cubic yards of earth-fill material was placed in the dam. It was purposely located on the left abutment and partly on the dam foundation, near the lower reaches of the dam, for processing materials located in this area and to avoid long hauls. The bins and screens of the mobile plant had been incorporated into this stationary plant. The plaintiff’s officials were not satisfied with the performance of this plant, and during the winter of 1940-1941, the plaintiff dismantled and incorporated it into a second stationary plant which was located somewhat higher, outside of the foundation area but in the lower area of the borrow pit.
18. The second stationary plant commenced operations in April 1941 at the start of the earth-filling season and proved quite efficient throughout the rest of the contract performance. An important adjunct to control the fall of the heavy rock down the chute was a Ross feeder, manufactured in England, and acquired from the Climax Molybdenum Company. A reciprocating feeder, constructed by a Denver company and operated by a 75-horsepower motor, required experimental tests and final adjustments which were accomplished in April 1941.
All of the embankment materials were placed by the end of 1942 except about 7,200 cubic yards of backfill which could not be placed until completion of the spillway walls.
19. During 1940, the plaintiff placed 204,000 cubic yards of embankment material separated by the mobile plant, and 149,000 cubic yards separated by the first stationary plant, or a total of 353,000 cubic yards.
With the second stationary plant, the plaintiff separated and placed 1,326,000 cubic yards of embankment during 1941, and 1,384,000 cubic yards during the 1942 season.
Both the mobile plant and the first stationary plant were structurally good, but experience in the field with the tough material encountered required the dismantling and reconstruction which finally resulted in a very satisfactory plant which permitted completion of the project within the contract period as extended.
*17 The total cost of machinery and equipment for the separating plants was approximately $108,557.00. It consisted of $60,000.00 for the screening plant; $15,690.00 for simplicity screens; $1,000.00 for the layout plan, and $31,867.00 for miscellaneous items. The field labor costs of erection and dismantling cannot be determined from the record.
20. Late in 1938, the plaintiff purchased 20 used Mack trucks for the project, at a cost of $85,000.00. They had been used on the construction of the Boulder Dam and another dam in the mountains near San Gabriel, California. Their previous owner had provided them with double-axle drive on four rear wheels. They were of the heavy duty type, widely used in heavy construction work. Each had a load capacity of 25 cubic yards and an empty weight of 42,000 pounds. They had great traction and were used by the plaintiff in 1939 for the uphill hauling of rock and other required excavation out of the low reaches of the dam site. The power-efficiency of their gasoline engines was substantially reduced by operation in the high altitude. They lacked the braking power of the Euclids later acquired for the downhill haul of heavy loads from the borrow pit. The plaintiff experienced some trouble with the Mack transmissions, which required strengthening and adjustments for a greater range of speed ratios.
In February 1940 the plaintiff acquired diesel engines and installed them in the Mack trucks, and the gasoline engines were junked. Thereafter, the Mack trucks were suitable equipment for the project.
The costs of overhauling the Mack trucks and converting them to diesel power were $86,075.00 for parts and material and $23,315.00 for labor. They were later transferred to plaintiff’s Jamaica Base job.
21. The plaintiff replaced the Mack trucks with 15 bottom dump Euclids of 18-cubic yard load capacity and 8 end-dump Euclids of 12-cubic yard capacity, at a total cost of $318,128.00. Of the bottom-dump type, six were acquired in October 1940, eight in April 1941, and one in July 1941. All of the end-dump Euclids were delivered in July 1941. They had greater braking capacity and the advantage of *18 bottom dumping in delivering materials upon the dam embankment.
22. In August 1939 the plaintiff purchased 9 new Cletrac tractors at a cost of $42,770.00, with an additional $2,400.00 for parts. They were ordered with over-sized engines especially for the project. Experience showed that they lacked weight for their power, as they tended to skid and spin on hard surfaces, although this was at least in part due to lack of familiarity of the tractor operators in the area with Cletracs.
In July 1940 the plaintiff purchased 9 D-8 caterpillar tractors, at a cost of $62,027.00. Early in the 1941 season the Cletrac tractors were transferred to the plaintiff’s Jamaica Base job. The progress of the job was not delayed by reason of the use of the Cletracs, nor were the costs of performance after September 15,1940, increased thereby.
23. At one time during a thawing period in 1939 the plaintiff had several of its Mack trucks stuck in the mud along a haul road. This occurred when muck and other materials were being excavated from the river bottom and transported upstream to disposal areas, and before regularly established haul roads had been constructed. The condition was corrected. Otherwise, the plaintiff maintained satisfactory haul roads.
In constructing its haul roads, the plaintiff used some of the separated material which had to be replaced by other materials excávated from the borrow pit and processed through the separation plant. This procedure was expedient, economical and reasonable.
Prior to September 20,1940, the plaintiff removed and disposed of some 5,000 cubic yards of materials that had slid onto a haul road, part of which was suitable for embankment use. While the defendant’s construction engineer critically reported this matter to his chief engineer, there is no evidence that plaintiff’s conduct in this respect was faulty or negligent or resulted in any increase in costs.
24. The plaintiff brought to the job a sheep’s-foot roller which had been used on another Bureau of Reclamation job, but which did not meet the specification for rollers on this project, and it was removed. The plaintiff did provide ade *19 quate tamping rollers in conformity with the contract requirements. There is no evidence that the work was delayed or the costs increased by the incident with respect to the one roller.
25. About September 1939, in the open cut excavation for the outlet channel, some overbreakage occurred outside of the neat lines specified, which the plaintiff was required to fill with concrete. Such incidents are usual where open cutting is performed in rough material and where large boulders lay across the line. The cost of concrete filling did not exceed that of dynamiting to a neat line. There was no fault or negligence on the part of the plaintiff, and the project was not delayed. Costs were not increased before or after September 15, 1940.
In February 1940, the plaintiff shot its first lift of rock in excavating for the powerhouse area. It used approximately 3,000 pounds of explosives, placed in 212 holes, 8 to 18 feet deep over a large area. A large mass of rocks was caused to roll down the side of the excavation and damaged about 82 feet of the left retaining wall for the outlet channel. The plaintiff repaired the wall at a cost of $2,000.00. There was no delay in the project work from this incident. The increased costs occurred prior to September 16,1940.
26. During performance of the project work prior to September 16, 1940, the plaintiff sustained a loss of $72,878.60, none of which is included in its losses thereafter sustained during the statutory period of the Lucas Act.
27. About September 19,1940, the plaintiff’s Bucyrus Erie 514-cubic-yard shovel became inoperable because of the breakage of a major part, and the borrow pit operations were delayed about one week through no fault or negligence of the plaintiff. The required part was found in California after some inquiry, and transported by airplane to Cheyenne, Wyoming, and then by automobile to the project site. During the delay, the plaintiff took the opportunity to make necessary repairs to the processing plant. This shovel was purchased new for the job and was an excellent piece of equipment.
28. On September 18, 1940, the plaintiff was engaged in placing concrete in the foundation walls of the powerhouse. *20 A pumpcrete machine had been used effectively in placing concrete in the diversion tunnel. The plaintiff had procured additional pipe and provided a 700-foot discharge line, and attempted to use the machine on the powerhouse. This procedure was abandoned after a small quantity of concrete-had been delivered because the machine could not properly deliver the concrete through the discharge line. A crane with boom and bucket was thereafter employed, and better control of the quantities required in the thin walls resulted. It became necessary to build an access trestle for the crane, and a delay of several days resulted in placing the powerhouse foundations, which was inconsequential to the conduct of the entire job. The attempted use and abandonment of the pumpcrete procedure did not constitute fault or negligence on the part of the plaintiff.
29. During the 1939 and 1940 construction seasons, the plaintiff generally employed its labor three eight-hour shifts per day, and at times, two eight-hour shifts. In the 1941 season, it became increasingly difficult to obtain competent labor and adequate materials and equipment parts, due to the national defense program and the demand for labor on other Government construction in the general area of the plaintiff’s project. The hours of earth-placing and shop and maintenance crews were increased during 1941 to 10 hours per day for six days a week, but concrete workers continued eight hours per shift, six days a week.
In 1942 the labor supply problems became progressively worse until there was a marked scarcity of available workmen. The project site was remote from any population centers. Defense plants and industry in Denver and other Colorado cities were offering laborers more money than plaintiff had been paying, under more attractive living conditions. In order to keep its working force together, the plaintiff had to increase wage rates, provide increased overtime work, and pay the workmen for stand-by time when work was temporarily curtailed by reason of inclement weather or breakdown of equipment. Beginning early in that construction season, after authorization by the defendant, the plaintiff worked all crews 10 hours a day, six days a week. In its letter of authorization, the defendant asserted *21 that the Government assumed, no liability for any increase in labor or other costs to be incurred by the contractor for increased rates of pay or overtime payments, to which statement the plaintiff replied in writing that it reserved its rights to recover such costs as might come within remedial legislation which had been or might be passed. On July 27, 1942, the plaintiff commenced working its entire shop, excavation and fill crews 12-hour shifts, 7 days a week, with its concrete and steel crews working 10-hour shifts, 7 days a week. Overtime pay was paid at one and one-half of the regular rates, except that some crafts were entitled under their contracts to double pay for all overtime in excess of 48 hours a week. The defendant’s project representatives and its Denver office knew of the plaintiff’s increase in the hours of employment, and the defendant’s construction engineer requested the plaintiff to apply for authorization to work employees in excess of the authorized 60 hours per week, but nothing more was done about the matter by either the plaintiff or the defendant. This employment schedule continued for several weeks until the earth work had progressed sufficiently for completion in 1942. Throughout 1942 the plaintiff’s labor turnover was high, and the shortage of labor required the employment and training of unskilled laborers to do skilled work, and assignment of skilled labor at times to common labor.
30. The plaintiff also encountered severe difficulties in 1941 and 1942 in obtaining materials and necessary parts for equipment maintenance, although it had provided an elaborate shop and a large inventory of supplies and parts. Make-shift repairs and maintenance work were required to keep the job going, and the plaintiff even resorted to electro-welding to keep the equipment in operation, all at greatly increased costs.
The 1942 operations were adversely affected by delays in the delivery of penstocks, reinforcing steel, turbines and generators, all of which were to be provided by the defendant. Because of these delays, the plaintiff had to do much work through the winter of 1942-43 at greatly increased cost in order to complete work which could more easily have been done during the regular 1942 construction season.
*22 31. As the work progressed, differences arose between the plaintiff and the defendant over the interpretation of various provisions of the contract and specifications, and the plaintiff filed claims with the defendant’s contracting officer. On December 30, 1941, all of the then outstanding claims were combined in one document and submitted to the defendant’s Undersecretary of the Interior and its Commissioner of the Bureau of Reclamation, Washington, D. C., for use at a conference to be held on January 8, 1942.
These claims exceeded 1.2 million dollars, and covered alleged increased costs from changes, changed conditions, improper classification of material, extra work, interference by defendant’s supervisory personnel, reduction of contract work, charges against plaintiff for wasted material, and a claim for providing school facilities.
32. On January 8, 1942, an informal conference was held between plaintiff and defendant, at which it was agreed that an attempt would be made to adjust the differences between the parties by amending the contract under the First War Powers Act of 1941.
On January 10, 1942, the plaintiff submitted a memorandum setting forth its estimated loss to the close of the 1941 work season in the sum of $700,000.00, proposing that the loss be divided equally with the defendant and that future operations be on a cost-plus-fixed-fee basis.
33. On February 10,1942, Executive Order 9055 was promulgated by the President extending to the Interior Department the powers theretofore extended to the War and Navy Departments and to the Maritime Commission by Executive Order 9001, issued pursuant to the First War Powers Act of 1941. The Department of the Interior thereby became a department or agency which, prior to August 14,1945, was authorized to enter into contracts and amendments or modifications of contracts under Section 201 of the First War Powers Act of 1941, within the meaning of Section 1 of the Lucas Act and Section 101.3 of Executive Order 9786 issued pursuant thereto.
34. At a meeting with representatives of the Bureau of Reclamation at Denver, Colorado, in the early part of March 1942, plaintiff was advised by the Bureau that because of ad *23 ministrative difficulties it was not in position to enter into a cost-plus-fixed-fee contract.
On March 3, 1942, plaintiff wrote defendant that it was indebted to the First National Bank of Chicago in the sum of $1,700,000 and had sustained a loss of approximately $700,000 on the Green Mountain job to the close of the 1941 construction season; that unless the contract was adjusted plaintiff would suffer an estimated additional loss of approximately $450,000; and that plaintiff had been informed by the bank that, in view of this situation, it would be unable to carry the loan without an adjustment in the contract. The First National Bank of Chicago, by letter dated March 16, 1942, wrote defendant to the same effect.
35. During March and the early part of April 1942, conferences were held by the defendant with the plaintiff and a representative of the First National Bank of Chicago, as a result of which an agreement was reached and an Amenda-tory Contract executed as of April 1,1942. It provided for an increase in the unit prices to be paid the plaintiff for certain items of work already done and also to be performed in the future, for the elimination of some items of work, and for compensation for certain items for which payment had been withheld.
The Amendatory Contract, executed by the plaintiff’s president and the defendant’s Secretary of the Interior, included among others, the following provisions:
Whereas, the power to be produced at the Green Mountain Power Plant is and will be needed to supply the requirements of industries in the area engaged in production of materials and supplies essential to the prosecution of the war, and appropriate priorities have been granted by the War Production Board for the purpose of expediting the production of said power; and
Whereas, the Contractor has sustained losses in excess of $650,000 on work already performed under the contract and is faced with proportionally heavy losses on the work remaining to be done, and unless the aforesaid contract is adjusted to relieve the Contractor’s circumstances, it will be unable to proceed with the work and complete the contract; and
Whereas, during the progress of the work differences have arisen between the Government and the Contractor as to the proper interpretation of the contract and the *24 rights of the parties thereunder, as a result of which the Contractor had submitted claims for additional compensation totaling approximately $1,200,000, which are at this time pending; and
Whereas, the Secretary of the Interior has determined that the prosecution of the war will be facilitated by adjustment of the terms of the said contract of November 15,1938, upon the terms and conditions of this contract, in order to make possible the continued prosecution and completion of the work by the Contractor:
* ■ * * * *
B. In consideration of the agreements contained in this amendatory contract, the Contractor hereby accepts the same in full settlement of, and releases the Government from, any and all claims and demands for additional compensation arising out of or in any manner connected with the said contract of November 15, 1938, or the performance of work thereunder to the date hereof. In addition, and without limiting the effect of the foregoing release, the Contractor hereby releases the Government from any and all future claims based upon, related to, or connected with either any claim the Contractor has heretofore made under the said contract or the performance of work thereunder to the date hereof.
The estimated net increase in the total contract price was $584,308.66, of which about $242,000 was applicable to work previously performed.
36. Because of the losses resulting from increased costs encountered in the 1942 season, the plaintiff again requested adj ustment of the contract. By letter dated August 15,1942, the plaintiff advised the defendant’s chief engineer that its costs of operation had increased substantially in 1942 over 1941 due to war conditions, and requested reimbursement of such increased costs. On August 27,1942, the chief engineer by letter replied that it did not appear that plaintiff’s contract, as amended, permitted reimbursement of the alleged increased costs due to causes claimed.
On September 11, 1942, the plaintiff wrote to the Commissioner, Bureau of Reclamation, advised of its increased costs for 1942 over 1941, and requested an opportunity to present the claim personally to the Commissioner. The Commissioner, by letter dated October 3, 1942, replied that while he would be glad to see the plaintiff’s president, the *25 Bureau would be unable to give relief in the situation described in the plaintiff’s letter.
Thereafter, the plaintiff’s president conferred with the Commissioner, who, by letter dated November 30, 1942, advised him, in part, as follows:
It is my impression, based particularly on the oral representations you made to me on November 30 and on the status of the job in the War Production Board’s list of construction projects to be completed, there may be in your situation aspects that would warrant my recommending some adjustment under the First War Powers Act, 1941. Of course, I cannot commit the Department to any course of action in your case. Nor do I by this letter commit the Bureau to any recommendation favorable to an adjustment.
However, on the basis of your oral representations I believe that you should proceed with the preparation of a statement showing the increases in your operation costs this year and the effect of such increases on your financial situation; stating the reasons for the increases; and setting forth your estimate of the costs to you of completing the work covered by your contract.
Your statement, when completed, should be submitted in triplicate to the contracting officer of the Bureau, the Chief Engineer in Denver, Colorado. He will arrange for such audit of your books and examination of your records as will enable him to make a factual report of the situation and to make a statement of what adjustment, if any, should in his judgment be made.
When your statement and the report and statement of the Chief Engineer are before me, I shall give prompt attention to the matter, and shall report to the Department what, if any, adjustment should in my judgment be made as a means of facilitating the prosecution of the war.
Since the Green Mountain Dam and Power Plant need to be rushed to completion as part of the War program, as recognized by recent action of the War Production Board, I hope that you will be able to make a prompt submission to the Chief Engineer.
37. On December 5,1942, the plaintiff submitted to the defendant’s chief engineer, the contracting officer, a detailed statement of its losses during the 1942 season to October 25, 1942, approximating $400,000.00, with its estimate of an additional loss of $170,000.00 on work to be performed at the *26 prevailing contract prices. The plaintiff therein asked that its books be audited by the Bureau and that the contract be modified so as to reimburse the plaintiff for the increased costs during the 1942 season to the conclusion of the job.
Following an audit of the plaintiff’s books and records by the Bureau, the Commissioner by letter dated August 12,1943, requested the plaintiff to submit a statement covering its operations after October 31, 1941, so that in a single document, plaintiff’s claim would be fully submitted.
Pursuant to this request, the plaintiff on September 15, 1943, submitted to the defendant’s chief engineer its second request under the First War Powers Act of 1941 for reimbursement for losses sustained on the Green Mountain project. The plaintiff stated its net losses due to war influences to be $650,722.54 after October 31, 1941, to June 30, 1943.
38. After another audit by the Bureau of the plaintiff’s books and records, and on June 1,1945, a second Amendatory Contract was executed by the plaintiff and by the Secretary of the Interior in behalf of the defendant. This document was dated as of November 30, 1942, and included, among others, the following provisions:
Whereas, the power from the Green Mountain Power Plant was and is needed to supply the requirements of industries in the area engaged m production of materials and supplies essential to the prosecution of the war, and appropriate priorities were granted by the War Production Board for the purpose of expediting the production of said power; and
Wheeeas, the Contractor sustained heavy losses during the progress of the work on account of increases in labor and materials costs resulting from the war, to the extent that, unless the contract was adjusted to relieve the Contractor’s circumstances, it would have been unable to proceed with the work and complete the contract; and
Whereas, the Secretary of the Interior determined that the prosecution of the war would be facilitated by an adjustment of the terms of the contract of November 15, 1938, in order to make possible the continued prosecution and completion of the work by the Contractor; and
*27 Whereas, pursuant to such determination an adjustment was made in the terms of the contract of November 15, 1938, providing for increased compensation to the Contractor for work performed thereunder, the terms and provisions of such adjustment being set forth in an Amendatory Contract between the Government and the Contractor dated April 1,1942; and
Whereas, despite such adjustment the Contractor continued to sustain heavy losses on work performed during the 1942 season on account of further increases in labor and materials costs due to war conditions, to the extent that, unless a further adjustment was made in the contract to relieve the Contractor’s circumstances, it would have been unable to proceed with the work and complete the contract; and
Whereas, the Secretary of the Interior having determined that a further adjustment in said contract in order to make possible the continued prosecution and completion of the work by the Contractor would facilitate the prosecution of the war, the Contractor was given assurances during the period from August 15, 1942, to November 30, 1942, that the contract would be further adjusted to provide for payment of the additional cost increases, the exact amount thereof to be determined later; and
Whereas, the amount of such additional cost increases has now been determined;

% % % % %

3. In consideration of the agreements contained in this Amendatory Contract, the Contractor hereby accepts the same in full settlement of, and releases the Government from, any and all claims and demands whatsoever for additional compensation arising, out of or in any manner connected with the said contract of November 15, 1938, as amended, or the performance of work thereunder due directly or indirectly to war conditions existing prior to or subsequent to the date hereof.
The Second Amendatory Contract provided for payment to the plaintiff of the additional sum of $244,608.02 on account of increases in costs due to war conditions. That sum was paid to the plaintiff by the defendant on July 26, 1945.
39. No further requests for relief under the First War Powers Act of 1941 were made by the plaintiff subsequent to its second request of September 15, 1943, and no such claim was pending and remained unsettled as of August 14, 1945, *28 as final action on all claims filed by the plaintiff had been taken by the defendant by that date.
40. On February 4, 1947, which was within the statutory time allowed by the Lucas Act, the plaintiff filed a claim in the amount of $584,407.52 with the defendant’s Secretary of the Interior for relief under the provisions of the Lucas Act.
On December 26,1947, the claim was denied by the Assistant Secretary of the Interior in a written decision which stated in part:
Despite the adjustment provided for in the amenda-tory contract, the contractor continued to operate under a schedule of rising costs throughout the working season of 1942. The contractor attributed these additional expenses to the shortage of materials and labor resulting from the demands of war industries. The Bureau of Reclamation believed that a substantial part of the contractor’s increase in costs had resulted from its inefficient operations.
* * * *
The claim submitted by the contractor under the act of August 7, 1946, is not a new claim but is merely a restatement of the claims previously made by the contractor for losses suffered under the contract as a result of increased costs. As I have stated, the two amenda-tory contracts in terms represented final action by the Department on these claims. Section 204 of the regulations therefore precludes consideration by the Department of the claim now presented by the contractor under the act of August 7,1946.
Finally, section 307 of the regulations would compel a rejection of the contractor’s present claim. Section 307 provides in part as follows:
Relief with respect to a particular loss claimed shall not be granted under the Act and these Regulations unless the war agency considering the claim finds * * * that relief would have been
f ranted under the First War Powers Act, 1941, if nal action with respect thereto had been taken by the war agency on or before August 14,1945.
Section 307 confines relief to claims pending before a department on August 14, 1945. As stated above, the Department had taken final action on the contractor’s claims before this date, and the contractor then had no claim pending before the Department.
*29 41. The plaintiff, being dissatisfied with the action of the Department of the Interior, filed suit under the provisions of Section 6 of the Lucas Act in the United States District Court for the District of Columbia on February 6, 1948. The defendant filed motions to dismiss and for summary judgment, which were denied by the Court on June 25,1948.
The defendant gave notice of an intention to seek a special appeal and on July 8, 1948, filed its petition for allowance of the same with the United States Court of Appeals for the District of Columbia.
On July 16, 1948, before the defendant’s appeal could be heard, the plaintiff elected to transfer the case for original disposition to the United States Court of Claims, pursuant to the provisions of the amendment to the Lucas Act, approved June 25, 1948, 62 Stat. 992. On August 7, 1948, the Court of Appeals dismissed defendant’s special appeal petition without prejudice.
On April 4, 1949, the Court of Claims overruled defendant’s motion to dismiss the plaintiff’s petition. 113 C. Cls. 265.
42. On October 31,1949, the plaintiff, pursuant to the Memorandum and Order as to Procedure in Lucas Act cases, issued by the Court of Claims, submitted to the defendant a detailed audit report relative to its claim. Thereafter, the plaintiff’s books and records were examined by the defendant’s accountants. The audits covered the entire period of the contract performance in order that proper adjustments and allocations could be made between the periods before and after September 16,1940.
A combined report of the audits, prepared jointly by the accountants for the plaintiff and the defendant, was received in evidence as Plaintiff’s Exhibit No. 59. The parties formally stipulated that this report was mathematically correct and accurate with relation to all contracts and subcontracts held by plaintiff under which work, supplies, or services were furnished for the defendant between September 16, 1940, and August 14, 1945. They differ with respect to the proper accounting method to be used to determine the profit or loss incurred by the plaintiff, within the meaning of the Lucas Act.
*30 The parties agree that prior to September IB, 1940, plaintiff’s income on the project amounted to $1,792,058.28 while its expenses were $1,864,936.88, or a net loss of $72,878.60 which is not included in this claim.
Comparative statements by the plaintiff and the defendant for the period after September 15, 1940, as set forth in Plaintiff’s Exhibit No. 59, are summarized as follows:

All amounts received by the plaintiff from the defendant under the two amendatory contracts are included within the above-stated income on the Green Mountain project.
The disputed items, with respect to proper adjustments and offsets, are: (a) Interest expense amounting to $158,812.01; (b) reallocation of equipment maintenance costs to the extent *31 of $20,332.89; (c) gain of $54,860.69 over depreciated book value in the amounts received as insurance payments for equipment destroyed by fire, and (d) equipment depreciation and maintenance costs as affected by gains on sales or rentals, which, last issue involves the total sum of $545,683.56.
While the plaintiff listed the $54,860.69 fire insurance item as a deduction from its contract losses, it now contends that it is not a proper offset under the Lucas Act.
43. In May 1941 the plaintiff entered into a joint venture with a New York firm under the name of J amaica Base Contractors. On May 14, 1941, the joint venture entered into a cost-plus-fixed-fee contract with the War Department for the construction of a defense base at Jamaica in the British West Indies. This contract was terminated April 18, 1942. The net amount received by the plaintiff for its share of the fee, pursuant to that contract, was $35,365.35.
During the months of June, July, and August 1941, the plaintiff shipped certain of its equipment, including the Mack trucks and detraes, from the Green Mountain project to be used in the performance of the Jamaica Base contract.
The Jamaica Base contract provided that the defendant, at its option, should have the right to purchase any part of the equipment on such job at a fair and reasonable valuation. On March 31, 1942, the defendant exercised its option and purchased plaintiff’s equipment on the Jamaica job for $588,500.00. The parties agree that the profit realized by the plaintiff, over and above the depreciated book value of the equipment, was $273,095.99.
The parties further agree that the Jamaica Base contract was one under which work, supplies, or services were furnished to the defendant within the meaning of Section 2 (a) of the Lucas Act and that the sum of $35,365.65, representing the plaintiff’s net fee, and the sum of $273,095.99, representing the plaintiff’s profit over and above the depreciated value of the equipment sold, are proper offsets against the plaintiff’s claim of losses under the Lucas Act on the Green Mountain Dam contract.
44. On May 4, 1943, the plaintiff leased part of its equipment which had been used on the Green Mountain project to the Raymond Jones Company of Dallas, Texas, for use in *32 connection with, certain construction for the War Department at Dennison Dam in Tesas. The Raymond J ones Company was a subcontractor of W. C. Shepherd & Company of Atlanta, Georgia, which had the prime contract with the defendant to perform the Dennison Dam work. The net amount received by the plaintiff from its rental of equipment to the Raymond Jones Company was $60,656.54. The parties agree that such amount is a proper offset under the Lucas Act against the plaintiff’s losses sustained on the Green Mountain contract.
45. Donations in the sum of $7,672.50 are included within the plaintiff’s Green Mountain performance costs. The parties agree that this expense is not a proper item of cost under the Lucas Act.
46. Interest in the sum of $158,812.01 is included within the plaintiff’s Green Mountain performance costs after September 15, 1940. Of that amount, the sum of $142,634.44 was properly allocable to the Green Mountain project, and $16,177.57 was allocable to the performance of the cost-plus-fixed-fee contract on the Jamaica Base.
The plaintiff knew when it submitted its bid that it would have to borrow substantial amounts of money to provide additional equipment, camps and facilities in the performance of the contract work. As of December 31, 1938, the plaintiff’s invested capital was $572,000.00, which, added to deferred income in the sum of $61,000.00 on an uncompleted contract, amounted to an effective invested capital of $633,000.00. The defendant considered the plaintiff financially qualified at the time of the awarding of the contract.
The contract specifications provided in part:
16. Payments. — In preparing estimates for partial payments the material delivered on the site and preparatory work done will not be taken into consideration.
On September 23, 1939, the plaintiff requested partial payments covering preparatory costs expended on equipment, machinery, camp, plant, roads, bridges and other job setups. It cited Article 16 of the contract, which provided that unless otherwise provided in the specifications, partial payments would be made as the work progressed at the end of each calendar month and that material delivered on the *33 site and preparatory work done might be taken into consideration in the preparation of estimates. The plaintiff’s request was denied by the defendant by letter dated October 27, 1939, which quoted the above provision of the specifications and stated in part:
* * * A like provision has been embodied in all construction contracts executed by the Bureau of Reclamation in the last seven years. The purpose of its inclusion is to require contractors to carry the cost of preparatory work.
By the end of 1941 the plaintiff had experienced losses in the performance of the contract in excess of $650,000.00. This loss overbalanced the plaintiff’s original capital and surplus accounts and created a deficit. Part of this loss was reduced by plaintiff’s recoveries under the first amendatory contract. It is reasonable to conclude that the interest incurred by the plaintiff after September 15, 1940, resulted from its inability to repay its loans due to the performance losses otherwise claimed in this case.
The interest expense of $142,634.44 was in the main paid on money borrowed from the First National Bank of Chicago, with minor amounts paid to equipment suppliers on sales contracts. It was not interest on invested capital. It is undisputed that it is in accordance with recognized commercial accounting practices to charge as a cost in the operation of a business, as the plaintiff did, interest on borrowed money, as distinguished from interest on invested capital.
47. On December 12,1942, the plaintiff leased certain of its equipment which had been used on the Green Mountain project to the McGeorge Contracting Company of Pine Bluff, Arkansas, for use by such company in stripping the overburden from certain bauxite deposits of the Republic Mining and Manufacturing Company at Bauxite, Arkansas.
The parties agree that this lease was not a contract or subcontract under which work, supplies, or services were furnished for the defendant within the meaning of Section 2 (a) of the Lucas Act.
The rentals received by the'plaintiff amounted to $258,-052.02. After the close of the 1942 work season the plaintiff spent $20,332.39 to put this leased equipment into good op *34 erating condition. At the time of the repairs, the plaintiff had no further use for this equipment on the Green Mountain project, nor any other contracts on which to use it. The repairs were made necessary by reason of wear and tear on the Green Mountain project, and were not in the nature of a major rehabilitation for the purpose of extending the life of the equipment and making it more valuable for purposes of sale or lease. The costs of these equipment repairs were not properly charged to the Green Mountain contract.
In its accounting statement, the defendant deducts the repair expenses from the Green Mountain performance costs and also offsets the net rentals in the sum of $237,719.63 from the plaintiff’s performance losses during the Lucas Act period.
48. On December 1, 1942, a fire at the dam site destroyed certain items of equipment. The plaintiff subsequently received the sum of $94,326.06 from its insurance carriers in settlement of the equipment losses. Of the amount received, the sum of $54,860.69 represented profit over and above the depreciated book value of the equipment destroyed by fire.
In its accounting statement, the defendant offsets the sum of $54,860.69 against the plaintiff’s performance losses during the Lucas Act period.
49. On January 28, 1944, the plaintiff sold to one Wesley Durston: (1) All of the equipment which it had previously leased to McGeorge Contracting Company (see Finding 47 swpra) and which was then located at Bauxite, Arkansas, for $162,586.55; (2) all of the equipment which it had leased to the Raymond Jones Company (see Finding 44 supra), and which was then located at Durant, Oklahoma, for $119,-643.70; and (3) all the residue of its equipment still located at the Green Mountain site and at Denver, Colorado, for $52,606.95. All of this equipment had been used on the Green Mountain project. The plaintiff realized thereon a profit of $290,409.01 over and above the depreciated book value of the equipment.
During the years 1941 and 1943, the plaintiff sold equipment that had been used on the Green Mountain project and realized net profits respectively of $123.33 and $18,020.71 over and above depreciated book value. During this period *35 the plaintiff sold other Green Mountain equipment on which it realized $589.12 less than the depreciated book value.
The total net gain realized by the plaintiff over and above depreciated book value amounted to $307,963.93. In its accounting statement, the defendant offsets this amount against the plaintiff’s performance losses. All of such equipment was sold to private individuals and concerns, and none to any department or agency of the defendant.
It was not the plaintiff’s policy to sell its equipment upon the completion of any job, but to retain it for use on future contracts. The equipment was mortgaged to the First National Bank of Chicago, and the plaintiff sold the equipment on account of its urgent need of money.
The plaintiff credited the net gain on equipment sales to its profit and loss account, and did not credit it to income on the Green Mountain contract nor apply it as an offset against its losses. The gain upon the sale of a capital asset depends upon the market value at the time of the sale. It does not represent an earning of the owner and is a proper credit to the profit and loss or surplus account.
50. The defendant offsets the plaintiff’s gains on equipment destroyed by fire (see Finding 48 supra) and upon equipment sales (see Finding 49 supra) on the theory that the plaintiff had incurred excessive costs either by overdepreciation or excessive repair and maintenance, or both, which increased the sale or replacement value of the equipment.
Most of the equipment that was destroyed by fire or that was sold had been originally acquired for employment on the Green Mountain project. None of the equipment upon which a capital gain was realized had been charged to the job as a cost of performance. The plaintiff applied depreciation on a straight-line basis, from year-to-year, which was properly charged as a cost. Depreciation was computed upon the actual cost of the equipment and was allocated upon an estimated period of useful life for each unit. The plaintiff’s system of depreciation was consistently applied during the contract period and prior thereto. It was in accordance with recognized commercial accounting practices. It conformed with Bulletin “F” of the Bureau of Internal Kevenue, received in evidence as Defendant’s Exhibit No. 20. The *36 defendant’s audit contains tlie identical amount for equipment depreciation as that reported by the plaintiff in the sum of $475,746.17. There is no evidence that the plaintiff’s expenditures for repair and maintenance of its equipment were in excess of that necessary to keep it in good working condition. There is no evidence with respect to changes in the market value of the equipment before, during, or after the contract performance period.
The plaintiff did not amortize any part of appreciated value of its equipment nor make any such charge against the Green Mountain contract. The depreciation rates applied had a reasonable relationship to the useful life of the equipment.
51. While the plaintiff’s petition alleges net losses in the sum of $584,407.52, the evidence in this case shows that plaintiff’s net losses on the Green Mountain contract during the Lucas Act period, as offset by all amounts received on all contracts and subcontracts under which work, supplies, or services were furnished for the defendant between September 16, 1940, and August 14,1945, amounted to $572,838.72, itemized as follows:
Performance loss on Green Mountain contract_$965,806.98
Less disallowed expenses included in above: Donations (finding 45)- $7,672.50
Interest expense allocated to Jamaica
Base job (finding 46)- 16,177.57
- 23, 850. 07
Net loss on Green Mountain contract_ 941,956. 91

Offsets

Net fee on Jamaica Base contract (finding 43)_ 35, 365. 65
Net gain on sale of equipment-Jamaica Base (finding 43)_ 273,095.99
Net income-Equipment Lease-Dennison Dam (finding 44)_ 60,656.54
Total offsets_ 369,118.18
Net loss after all offsets_ 572, 838. 73
None of the plaintiff’s net losses in the sum of $572,838.73 was caused by any fault or negligence on the part of the plaintiff.
*37 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is equitably entitled to the sum of $572,838.73 in settlement of its claim. Therefore, pursuant to Section 6 of the Lucas Act, 60 Stat. 902, as amended by 62 Stat. 869, 922, the Bureau of Reclamation, Department of the Interior, is directed to settle such claim in the amount of five hundred seventy-two thousand eight hundred thirty-eight dollars and seventy-three cents ($572,838.73).

Opinion Amended

In this case, on a stipulation by the parties agreeing to settlement, the above opinion was amended in accordance with the order below:
ORDER
This case comes before the court on a stipulation of settlement filed on December 30, 1953.
Whereas, the court on September 30, 1953, as amended December 1, 1953, rendered a decision directing the Bureau of Reclamation, Department of Interior, to settle plaintiff’s claim under the Lucas Act in the amount of $572,838.73, and
Whereas, the parties, being desirous of prompt disposition of this case, have entered into a stipulation of settlement signed on behalf of the plaintiff by its attorney of record and on behalf of the defendant by the Assistant Attorney General in which it is stated that plaintiff submitted an offer to the Attorney General on December 3, 1953, to settle its claim recovered in this case for the sum of $507,500 which offer was duly accepted by the Attorney General on December 21, 1953.
Now, therefore, it is ordered this sixth day of January 1954, that the decision rendered in this case on September 30, 1953, as amended December 1, 1953, is amended in that pursuant to Section 6 of the Lucas Act, 60 Stat. 902, as amended by 62 Stat. 869, 922, the Bureau of Reclamation, Department *38 of Interior, is directed to settle plaintiff’s claim in the amount of Five Hundred Seven Thousand Five Hundred Dollars ($507,500).
By the Court:
Maevin Jones,

Chief Judge.